IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KOLBE & KOLBE MILLWORK, CO., INC.,
AWARD HARDWOOD FLOORS, LLP,
SUPERIOR MILLING, INC., and
TRUSTOR COATINGS, LLP,
on behalf of themselves and other similarly
situated individuals and/or entities,

                                  Plaintiffs,                          OPINION AND ORDER

       v.                                                12-cv-00879-wmc

MANSON INSURANCE AGENCY, INC.,
ST. PAUL FIRE & MARINE INSURANCE COMPANY,
THE TRAVELERS INDEMNITY COMPANY,
DAVID R. SCHOLFIELD,
TIMOTHY MATHWICH,
ABC INSURANCE COMPANY,
XYZ INSURANCE COMPANY,

                                  Defendants.

---

For years, Manson Insurance Agency sold insurance throughout Wisconsin on behalf of national insurers, including The Travelers Indemnity Company and St. Paul Fire & Marine Insurance Company.  Manson also collected premium payments and distributed rebate checks for national insurers, in an arrangement known as "agency billing."  Unfortunately, mediating these financial transactions between clients and insurers created an opportunity for Manson executives to embezzle, and embezzle they did -- ultimately diverting several million dollars to their own use.  This lawsuit is a putative class action by the insureds to recover their money, naming as defendants not only Manson and its guilty executives, but also Travelers and St. Paul Fire & Marine.

Plaintiffs seek to hold the national insurers directly liable for their negligence in supervising Manson, as well as indirectly liable on an agency theory. Travelers and St. Paul Fire & Marine have responded with a joint motion to dismiss, contending that the alleged facts form no basis for direct or derivative liability. The court agrees with this argument in large part, but finds that the complaint does state a viable cause of action against the national insurers with respect to Manson's acts of fraud accomplished under the guise of apparent agency authority. As explained in further detail below, the motion to dismiss will be denied as to that claim, but granted in all other respects.

## BACKGROUND[1]

Until 2009, Manson Insurance Agency, Inc. ("Manson Insurance") sold personal and commercial insurance policies in Wisconsin as an authorized agent of several national insurance companies, including defendants St. Paul Fire & Marine Insurance Company and Travelers Indemnity Company (who for reasons of simplicity will be referred to collectively as "Travelers"). Manson Insurance had the authority to underwrite, bind and issue insurance policies on Travelers' behalf, and to conduct all necessary functions incidental to this authority. Under what is known as "agency billing" practice, Manson Insurance also acted as Travelers' authorized billing agent for existing policies, collecting premiums, disbursing credits and rebates, and acting as a communications intermediary on all billing matters. Travelers retained the authority to

---

[1] For the purposes of this motion, the court will construe all of plaintiffs' factual allegations as true and draw all reasonable inferences in their favor. Fed. R. Civ. P. 12(b)(6); *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010).

control Manson Insurance's collection and distribution duties, along with the authority to audit, monitor and supervise its activities.

At some point, David Scholfield, Timothy Mathwich and other top Manson executives (collectively, "Manson") began to skim from this stream of money flowing between the policyholders and national insurers. Their fraudulent scheme had two parts: (1) a "premium add-on" element, in which they sent inflated premium invoices to clients, and (2) a "credit and rebate conversion" element, in which they cashed rebate checks from Travelers meant for clients. To facilitate the latter theft, Manson set up a P.O. Box in Wausau, Wisconsin, as a centralized address for Travelers' customer accounts. Travelers was aware that Manson Insurance was collecting mail at a single P.O. Box, and that it had authority to communicate with customers regarding financial matters, but did not further investigate its books or billing practices. The executives were eventually caught by the FBI, leading to their criminal prosecution and ultimately to this lawsuit.

OPINION

Dismissal pursuant to Rule 12(b)(6) is proper "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss, a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff need not provide detailed factual allegations, but must provide "enough facts to raise [the claim] above the level of mere speculation." *Riley v. Vilsack*,

665 F. Supp. 2d 994, 997 (W.D. Wis. 2009).  In reviewing the sufficiency of a complaint under the plausibility standard, the court will accept the well-pleaded facts in the complaint as true, but "need not accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements."  *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

Plaintiffs have presented a six-count complaint, consisting of claims for: (1) common law conversion; (2) negligence on the part of Travelers in supervising and monitoring Manson;[2] (3) civil liability under Wis. Stats. § 895.446 for the crimes of theft and unauthorized use of identifying information and documents; (4) common law intentional misrepresentation; (5) common law negligent misrepresentation; and (6) common law strict liability misrepresentation.

Mathwich, Scholfield and Manson Insurance Company (again, collectively "Manson") have defaulted, and for purposes of this opinion there is no dispute that the complaint alleges viable claims as to those defendants.  Travelers' liability, on the other hand, is the subject of vigorous debate.  The allegations show that Manson acted outside the scope of its agency relationship with Travelers when it committed the acts of theft and fraud, and give no indication that Travelers was negligent in supervising and monitoring Manson at the time the torts were committed.  Therefore, Count 2 must be dismissed entirely, and Counts 1 and 3-6 must be dismissed insofar as they rely on a theory of *respondeat superior* for Manson's actions.  Even so, Travelers does not get away completely unscathed: because Manson was acting as an *apparent* agent of Travelers when

---

[2] Although Count 2 is directed at all defendants, plaintiffs have clarified in their brief that it is meant to apply only to Travelers.  (Dkt. #40, at 32-33.)

it defrauded plaintiffs, Travelers may be liable on an apparent agency theory for Manson's tortious "premium add-on" scheme under Counts 1 and 4-6.

## I. Travelers' Derivative Liability for Manson's Torts (Counts 1 & 4-6)

Under Wisconsin common law, agency doctrine allows a person to bind and be bound by the actions of another designated to act on his or her behalf. *Troy Co. v. Perry*, 68 Wis.2d 170, 174, 228 N.W.2d 169, 171 (1975) (quoting Restatement (Second) of Agency § 1(1) (1958)). The two necessary actors are a "principal" and an "agent," the latter of which is defined as "a person authorized by another to act on his account and under his control." *Arsand v. City of Franklin*, 83 Wis.2d 40, 48, 264 N.W.2d 579, 583 (Wis. 1978).

"Agents" are further divided into (1) "servants" (agents for purposes of performing physical tasks on behalf of "masters"); and (2) "non-servant" agents (agents for purposes of contracting or other non-physical tasks). *Id.* at 49-50. When a master/servant agency relationship exists, derivative liability for an agent's acts is also known by the Latin phrase *respondeat superior*. *Id.* at 47-48. "Under the doctrine of *respondeat superior*, a master is subject to liability for the tortious acts of his or her servant." *Pamperin v. Trinity Mem'l Hosp.*, 144 Wis.2d 188, 198, 423 N.W.2d 848, 852 (1988). The related doctrine of "apparent" agency operates to bind a party to the actions of a person he or she has caused third parties to reasonably believe is the party's agent, even when no agency relationship actually exists or when the agent is acting outside the scope of any actual agency authority. *See* Restatement (Second) of Agency §§ 159, 261; *Schaefer v. Dudarenke*,

89 Wis.2d 483, 489-90, 278 N.W.2d 844, 847 (Wis. 1979).  Seeking to hold Travelers liable for the Manson's torts, plaintiffs argue that Manson was both servant and an apparent agent of Travelers.

### A. Respondeat Superior

A master's *respondeat superior* liability extends to acts of servants undertaken in the course of the agency relationship, which is defined by "whether the servant has stepped aside from the business of his principal to accomplish an independent purpose of his own, or whether he was actuated by an intent to carry out his employment and to serve his master."   *Linden v. City Car Co.*, 300 N.W. 925, 926 (Wis. 1941); *see also* Restatement (Second) of Agency § 228 ("Conduct of a servant is within the scope of employment if, but only if: . . . (c) it is actuated, at least in part, by a purpose to serve the master . . . .").

Travelers acknowledges that Manson was its agent for the purposes of selling insurance and for billing customers, including the tasks of invoicing and transferring payments under the "agency billing" relationship.  (Def's Br., dkt. #32, at 13 n.2.)  But Travelers argues -- and the court agrees -- that even reading the complaint in the light most favorable to plaintiffs, Manson was not acting within the scope of that agency relationship when it overbilled customers and stole their rebate checks.  None of the allegations suggest that this stolen money was ever passed on to Travelers, or that the Manson executives were motivated in their scheme by a desire to advance Travelers' business.  Indeed, the Manson executives were arguably stealing from Travelers itself, if

not directly, then at least by destroying the value Travelers sought to deliver to its customers and by undermining customer good will.

In response, plaintiffs point to the portion of the complaint alleging that Mathwich and Scholfied "[a]t all times acted within the scope of its agency, on behalf of Travelers." (Am. Compl. ¶41.)  This is only a legal conclusion, which is no longer adequate to meet the pleading standards imposed by Fed. R. Civ. P. 8(a) after *Twombly* and *Iqbal*, even if it might arguably have been before.  Plaintiffs' blunt allegation that the Manson defendants were acting to further Travelers' interests shares the very weakness criticized in *Iqbal* -- it attributes a facially implausible state of mind to a defendant without any support from concrete factual allegations.  See *Iqbal*, 556 U.S. at 680-81 (holding that a court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged). Indeed, it is contradicted by the specific facts alleged:  Manson's blatant thefts at issue were in their interest, not Travelers'.

Contrary to plaintiffs' suggestion, the existence of *some* master/servant relationship between Travelers and Manson does not provide a basis to assume that Manson's harmful acts were taken in furtherance of the agency relationship.  See *Heritage Christian Schools, Inc. v. ING N. Am. Ins. Corp.*, 851 F. Supp. 2d 1154, 1159 (E.D. Wis. 2012) ("[N]o principle of agency law of which I am aware imputes to the principal liability for unlawful acts that do not benefit the principal simply because the agent also engages in similar, lawful acts that do.").  In this respect, the factual allegations in this case are comparable to *Korntved v. Advanced Healthcare, S.C.*, 2005 WI App 197, 286 Wis.2d 499,

704 N.W.2d 597 (2005), an unsuccessful lawsuit against a medical laboratory for the torts of its lab technician employee.  The technician in *Korntved* abused her work access to a medical records database, viewing private records for her own purposes in violation of the laboratory's internal policies and Wisconsin privacy laws.  *Id.* at ¶¶2-4.  Although the misbehaving employee was unquestionably a "servant" of her employer in the sense that the employer had a right to control her actions on the job, including her access to the database, the *Korntved* court found the employer not liable as a matter of law because the employee's actions were outside the scope of this master/servant relationship -- her motives were entirely personal.  The court might just as easily have been speaking of this case when it observed that the employer "was damaged by [the employee's] indiscretions . . . . [the employer] did not benefit from [her] actions nor did [it] authorize such actions, [so it] should not be held liable for her willful, intentional and criminal actions." *Id.* at ¶3.

### B.  Apparent Agency

The question is a much closer one when it comes to application of the doctrine of apparent authority or apparent agency on the facts alleged here.  Under this doctrine, "a principal may be held liable for the acts of one who reasonably appears to a third person, through acts by the principal or acts by the agent if the principal had knowledge of those acts and acquiesced in them, to be authorized to act as an agent for the principal." *Pamperin*, 144 Wis.2d at 203, 423 N.W.2d at 853-54.  Apparent agency is commonly applied in contract disputes, but it appears a less-than-firmly settled question under

8

Wisconsin law whether the doctrine extends to tort claims.  Because the greater weight of authority suggests it is available for tort claims, the court concludes that the apparent authority bestowed upon Manson by Travelers in the eyes of plaintiffs means that Travelers may be liable for Manson's frauds, at least as alleged.

### i.   Availability of the Doctrine

The parties strenuously disagree over the threshold question of whether it is possible to apply the doctrine of apparent authority to Wisconsin tort claims.  This disagreement is understandable, given seemingly contradictory treatment of this issue by the Wisconsin Supreme Court.  Moreover, while the Second Restatement of Agency supports the use of the "apparent agency" doctrine in tort cases, *see* Restatement (Second) of Agency §§ 261-67, there are few examples of the doctrine being applied -- or even discussed -- in recent tort cases under Wisconsin law.

Plaintiffs contend that there is no need to settle the broad question of whether the apparent authority applies to all Wisconsin tort claims because the state legislature has already said that the doctrine extends to claims against insurance companies. Specifically, plaintiffs cite to Wis. Stat. § 628.40, which states that "[e]very insurer is bound by any act of its agent performed in this state that is within the scope of the agent's apparent authority."  Taken out of context and read generously, this quoted phrase arguably resolves the doctrines applicability to tort claims, although a closer look at the statutory context would support a different reading.  *See Roberts v. Sea-Land Servs., Inc.*, 132 S.Ct. 1350, 1357 (2012) (citation omitted) ("It is a fundamental canon of

9

statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

Section 628.40 is found within a Code chapter entitled "Insurance Marketing" that addresses the solicitation and formation of insurance contracts – in other words, applies to the acts of an insurance agent as *sales agent* rather than as a billing agent.  In this light, the most sensible interpretation of § 628.40 makes insurers liable for the torts of their agents committed during the course of insurance sales, which makes sense given the general congruence of interests between insurer and agent when it comes to selling policies.  The apparent agency relationship at issue in this case does not fall into that category.  Rather, plaintiffs claim to have been relying on the apparent authority of Manson to collect and forward premium payments during the life of the policy, which falls within Manson's clerical "agency billing" responsibilities.

In the absence of controlling statutory law, the court must turn to Wisconsin common law jurisprudence for guidance on the subject of whether "apparent authority" can be invoked in tort cases generally.  The few Wisconsin law cases that have touched on the question in the past century leave a somewhat inconsistent, but fortunately fairly one-sided, record.  A brief survey of the relevant law should probably begin with the 1932 case *Ripon Knitting Works v. Railway Express Agency*, 207 Wis. 452, 240 N.W. 840 (Wis. 1932), in which the Wisconsin Supreme Court affirmed a decision in favor of a manufacturer and against a shipping agency for the fraudulent acts of its agent, who repeatedly overcharged the manufacturer under the guise of presenting legitimate shipping bills.  *Id*. at 842.  The court cited § 485 of the Restatement (First) of Agency for

10

the proposition that "[a] principal who puts an agent in a position while apparently acting within his authority, to commit a fraud upon third persons, is subject to liability to such third persons for such fraud." *Id*.

Other early Wisconsin cases acknowledged the applicability of the doctrine of apparent authority to tort claims, although admittedly in *dicta*. *E.g. Motor Castings Co. v. Milwaukee Cnty Bank*, 254 Wis. 493, 499, 36 N.W.2d 687, 690 (Wis. 1949) (noting in *dicta* that "[i]t is a well established rule that when a principal puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud, the principal should stand the loss" (citing Restatement of Agency § 261)); *see also Mattice v. Equitable Life Assurance Soc. of U.S.,* 270 Wis. 504, 509, 71 N.W.2d 262, 265 (Wis. 1955) (citing with approval *Ripon Knitting Works* and *Motor Castings Co.*, quoting Restatement of Agency §§ 261 and 262, and noting in *dicta* that "[a]s general rules of the law of agency they are correct"[3]).

Then, in 1978, the Wisconsin Supreme Court arguably reversed course when it decided *Candee v. Egan*, 84 Wis. 2d 348, 267 N.W.2d 890 (Wis. 1978). In that case, a plaintiff, whose sporting goods store was seized by a receiver on behalf of the plaintiff's creditors, sued the receiver's employer for the receiver's alleged acts of wasting the assets of the store. Writing for the court, Justice Callow rejected the plaintiff's tort claim to the

---

[3] Section 261 states: "A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Section 262 states: "A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him, under the rule stated in sec. 261, is not relieved from liability by the fact that the apparent agent acts entirely for his own purposes, unless the other has notice of this."

extent that it was based on the doctrine of apparent authority, holding that "concepts of apparent authority are used to bind the principal contractually.  Corporate liability in tort, as alleged in this case, must be predicated on a theory of respondeat superior."  *Id.* at 369.

Only a few months later, in another opinion authored by Justice Callow, the Wisconsin Supreme Court seemed to change its mind again, without addressing the contradictory language in *Candee*.  In *Hollingsworth v. American Finance Corp.*, 86 Wis.2d 172, 271 N.W.2d 872 (1978), the Court allowed a usury claim against a finance company under the Wisconsin Consumer Act after that company's agent stole loan repayments made by a debtor.  *Id.* at 183-84.  In that case, the court cited *Motor Castings Co.*, 254 Wis. 493, 499, 36 N.W. 2d 687 (1949), and Restatement (Second) of Agency § 262, in holding that a "principal is bound by [its] agent's acts within the scope of [] apparent authority.  This rule applies even though the agent commits a fraud or acts against the principal's interests."  *Id*. at 181 (internal citations omitted).

Since *Hollingsworth*, the Wisconsin Supreme Court has addressed the question of apparent authority and tort liability only in the context of deciding whether a hospital can be liable for the negligence of independent contractor doctors cloaked in the hospital's apparent authority.  See *Kashishian v. Port*, 167 Wis. 2d 24, 481 N.W.2d 277 (Wis. 1992) (apparent authority approved as grounds for imposing liability against hospital for negligent acts of independent physicians); *Pamperin v. Trinity Memorial Hosp.*, 144 Wis.2d 188, 423 N.W.2d 848 (Wis. 1988) (same).  At the very least, these cases suggests that if there ever was a categorical bar on applying the apparent authority

doctrine to tort liability, it no longer exists.  Furthermore, nothing in the cases precludes an understanding that, rather than establishing a narrow exception to a general prohibition on using apparent agency in tort cases, they represent an expansion of an already broadly-applicable doctrine.

With the above-described body of caselaw to draw upon, the court must use its "own best judgment to estimate how the [Wisconsin] Supreme Court would rule" in this instance.  *Blood v. VH-1 Music First*, 668 F.3d 543, 546 (7th Cir. 2012).  The Seventh Circuit has said that "district courts are encouraged to dismiss actions based on novel state law claims . . . . [and] [w]hen confronted with a state law question that could go either way, the federal courts usually choose the narrower interpretation that restricts liability."  *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000) (citations omitted).  These admonishments notwithstanding, the court's best reading of the cases decided under Wisconsin law is that the doctrine of apparent authority applies to tort claims in general and to plaintiff's claims here in particular.

The reasons for this holding are three-fold.  *First*, as outlined above, the majority of available Wisconsin cases either hold or suggest that apparent authority can be used in tort claims.  The *Candee* decision stands as a notable outlier, but its holding does not appear the result of a thorough examination of the law.  Indeed, the *Candee* decision does not cite any caselaw in support of its holding on this point, nor has a Wisconsin court since cited *Candee* for this proposition.  *Second*, although not dispositive, at least one post-*Candee* federal court decision applying Wisconsin common law has characterized (albeit in *dicta*) the apparent authority doctrine as applicable to tort claims.  *Heritage Christian*

13

*Sch., Inc. v. ING N. Am. Ins. Corp.* 851 F. Supp. 2d 1154, 1159 (E.D. Wis. 2012) (noting in dicta that "apparent authority does make [insurance companies] liable for the [their agent and her husbands'] common-law fraud even though the fraud did not benefit [the companies] and the [agent and husband] were on a frolic of their own, since the fraud was committed through use of the apparent authority in which ING and Security Life had cloaked the[m].").  *Third*, it seems the better rule of law to expansively apply a legal doctrine that no less august an authority than the United States Supreme Court has called good policy:  "It is . . . for the ultimate interest of persons employing agents, as well as for the benefit of the public, that persons dealing with agents should be able to rely upon apparently true statements by agents who are purporting to act and are apparently acting in the interests of the principal."  *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 567 (1982) (quoting Restatement § 262, cmt a, and noting that the "apparent authority theory has long been the settled rule in the federal system").

### ii.   Apparent Agency Doctrine Applied to the Allegations in the Complaint

For liability to attach under the doctrine of apparent authority, "three elements must be present: (1) acts by the agent or principal justifying belief in the agency; (2) knowledge thereof by the party sought to be held; (3) reliance thereon by the plaintiff, consistent with ordinary care and prudence." *Pamperin v. Trinity Memorial Hosp.*, 144 Wis.2d 188, 203, 423 N.W.2d 848, 853-54 (Wis. 1988) (internal quotation marks omitted).  These three elements were all present when Manson fraudulently overbilled

plaintiffs.  The third element was *not* present when Manson converted the rebate and credit checks mailed by Travelers.

### a.  Premium Overbilling Scheme

Plaintiffs allege that "[t]hrough Travelers' agency billing practice, Manson acted as Travelers' authorized billing agent in collecting premiums" (Am. Compl. at ¶ 24); enumerate Manson's billing activities, which the court will infer for this motion were all carried out with Travelers' approval (*id.* at ¶ 37-38); allege that "plaintiffs had knowledge of specific acts, by Manson and/or Travelers, that justifie[d] their conclusion that Manson was acting as an agent for Travelers" (*id.* at ¶ 38); and allege that "plaintiffs relied on the agency relationship" (*id.* at ¶ 39).  On these contentions, all of which are plausible, it appears that the three conditions for apparent agency liability are met.

Still, Travelers has two objections.  The first objection is that the allegations contain no facts suggesting that the appearance of agency can be traceable to Travelers, which never directly contacted plaintiffs to announce that an agency relationship existed between itself and Manson.  While it is true that a "principal is only liable for that appearance of authority caused by himself," *Amplicon, Inc. v. Marshfield Clinic*, 786 F. Supp. 1469, 1476 (W.D. Wis. 1992) (emphasis omitted), Travelers is mistaken in arguing that this means a principal must affirmatively indicate to third parties that an agency relationship exists.  Even where the agent is the only one to make an explicit claim of an agency relationship, the principal can be liable so long as "the principal had knowledge of [the agent's] acts and acquiesced in them." *Pamperin*, 144 Wis. 2d at 203.

Although the complaint does not state in so many words that Manson held itself out to plaintiffs as Travelers' sales and billing agent, the inference can be made from the allegations that "Manson operated as an authorized agent for Travelers and sold Travelers insurance products" and then "collected premiums, for Travelers, from plaintiffs and the class."[4]   (Am. Compl. ¶¶ 20, 37.)   For its part, Travelers not only acquiesced in plaintiffs' belief in just such an agency relationship, it actively took advantage of that belief by using Manson as its intermediary.   (*Id.* at ¶¶ 37-39.) Travelers' approval of Manson's actions distinguishes the alleged facts from the cases Travelers cites, where the defendant principals either did not know about or did not acquiesce in the purported agent's unilateral representations about its authority. *See, e.g., Holmes v. Allstate Corp.*, No. 11 Civ. 1543, 2012 WL 627238 (S.D.N.Y. Jan. 27, 2012) (defendant did not know about or acquiesce in agent's claims that he had authority to make promises regarding how the plaintiffs' money would be spent or invested).

Travelers' second objection is that even if plaintiffs were aware that Manson claimed to be selling and maintaining Travelers insurance policies as a licensed agent, plaintiffs plead no concrete facts from which to infer that they actually relied on this claimed agency relationship.   On the contrary, the complaint expressly states the necessary fact: "plaintiffs relied on the agency relationship between Manson and Travelers."   (Am. Compl. ¶ 39.)    Even if one calls this a mere legal conclusion, it is certainly plausible enough in light of all the other facts alleged in the complaint.   See

---

[4]  If, contrary to this inference, Manson in fact never held itself out as a Travelers agent and none of the plaintiffs knew they were purchasing a Travelers' insurance policy, Travelers is welcome to move for summary judgment on apparent agency liability.

*Engel v. Buchan,* 710 F.3d 698, 709 (7th Cir. 2013) (noting that "legal conclusions can provide the framework of a complaint" so long as they are "supported by factual allegations," (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679)). The supporting facts are there: plaintiffs actually purchased Travelers insurance policies from Manson (Am. Compl. at ¶ 20); and they proceeded to pay premiums for Travelers' insurance to Manson (*id.* at ¶¶ 37-39), even when the premium invoices were (unbeknownst to them) inflated (*id.* at ¶ 44). This behavior would be inexplicable *unless* plaintiffs were relying on the apparent agency relationship.

### b.  Rebate/Credit Conversion Scheme

Unlike the premium add-on scheme discussed above, liability for Manson's credit and rebate conversion scheme is not possible using the apparent agency doctrine unless there is some nexus between plaintiffs' reliance on the agency relationship and the tort that was committed. Although often left implicit in descriptions of the apparent agency doctrine, essential to the doctrine's application in the tort setting is that it "gives rise to tort liability [only] where the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency." *Rice v. Panchal*, 65 F.3d 637, 645 (7th Cir. 1995) (quoting Illinois state law); *see also* Restatement (Second) of Agency § 265(1) ("A master or other principal is subject to liability for torts *which result from* reliance upon, or belief in, statements or other conduct within an agent's apparent authority." (emphasis added)). Courts faced with a claim of apparent agency in a tort suit must therefore ask whether there is a causal nexus between a plaintiff's reliance on the appearance of agency and the harm done by the apparent agent.

17

When the tort is fraud or misrepresentation, there is no difficulty in finding the causal nexus between the appearance of agency and the tort because the plaintiff's reliance upon the appearance of agency is necessary to the commission of the tort. *See, e.g., Am. Soc'y of Mech. Eng'rs*, 456 U.S. at 566 ("Under an apparent authority theory, '[l]iability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.'" (quoting Restatement (Second) of Agency § 261, cmt. a)); *see also* Restatement (Second) of Agency § 266. To a lesser extent, the same may be true for proving reliance, which causes a plaintiff to place him- or herself under the special care of a purported agent, as in cases of medical negligence. *See Pamperin*, 144 Wis. 2d. at 203; *see also* Restatement (Second) of Agency § 267.

There is no such causal nexus in this case between plaintiffs' reliance on Manson's apparent agency and the acts at the center of Manson's credit and rebate conversion scheme. Plaintiffs' reliance was not what enabled Manson to steal their mail -- if anything, it was *Travelers*' reliance on Manson to forward the mail rather than sending it directly that put Manson in a position to steal. Rather than pursue Travelers for converted rebates and credits under a theory of indirect liability, plaintiffs' claim, if any, is against Travelers directly insofar as these payments were owed them under the insurance contract.

## II. Travelers' Direct Liability for Negligence in Supervising and Monitoring Manson (Count 2)

In Count 2 of their complaint, plaintiffs seek to hold Travelers directly liable for the tort of negligent supervision, alleging that Tavelers "had an affirmative duty to exercise reasonable care with respect to the rights of plaintiffs and the class" and "fail[ed] to take reasonable steps to supervise, monitor, and/or protect plaintiffs" from Manson. (Am. Compl., dkt. #28, at ¶¶ 62-65.)  Travelers argues that this claim must be dismissed because none of the alleged facts demonstrate that it breached a duty of care.  The court agrees.

The four required elements for a negligent supervision claim under Wisconsin law are (1) the existence of a duty of care on the part of the supervisor, (2) a breach of that duty of care, (3) a wrongful act of the supervisee that was a cause of injury to the plaintiff, and (4) an act or omission of the supervisor that was a cause of the supervisee's wrongful act.  *See Sigler v. Kobinsky*, 2008 WI App 183, ¶ 9, 314 Wis.2d 784, 791, 762 N.W.2d 706, 709 (Wis. Ct. App. 2008).

The dispute between plaintiffs and Travelers centers on the first two prongs of this test -- whether plaintiffs have pleaded facts showing Travelers failed to exercise reasonable care by neglecting to audit Manson's performance as a billing agent.

> [A] duty to use ordinary care is established whenever it is foreseeable that a person's act or failure to act might cause harm to some other person.  The mere possibility of harm is insufficient to establish negligence.  The duty to act or refrain from acting in a particular case arises from probabilities, rather than from bare possibilities of injury.  Failure to guard against the bare possibility of injury is not actionable negligence.

*Id.* at ¶ 10 (internal citations omitted).  In light of this standard, the dispositive question is whether the agency billing arrangement alleged by plaintiffs amounts to a situation

that "a reasonable person would recognize as creating an unreasonable risk of injury or damage." *Behrendt v. Gulf Underwriters Ins. Co.*, 2009 WI 71, ¶ 52, 318 Wis. 2d 622, 649, 768 N.W.2d 568, 581 (Abrahamson, C.J., concurring) (quoting Wis JI-Civil 1005).  Put another way, the court asks whether agency billing presents a "bare possibility" of injury or the foreseeable likelihood of injury needed to find negligence.

Examples help to flesh out this distinction.  It is "not reasonably foreseeable that permitting employees to have unsupervised access to the internet [at work] would probably result in harm to some person or some thing," such that an employer has a duty of care to monitor the employee's internet usage for illegal acts of employees.  *Sigler*, 2008 WI App at ¶ 10; *see also Maypark v. Securitas Sec. Serv's USA, Inc.*, 2009 WI App 145, ¶15, 775 N.W.2d 270, 275, 321 Wis.2d 479, 488 (Wis. App. 2009) (same).  Similarly, although a position in the clergy bestows authority that (as we have tragically learned) can lead to sexual abuse of children, a parishioner has no negligent supervision claim against an archdiocese absent evidence that the archdiocese knew or should have known of a guilty priest's abusive tendencies.  *Doe v. Archdiocese of Milwaukee*, 2005 WI 123, ¶¶45-46, 284 Wis. 2d 307, 333-34, 700 N.W.2d 180, 192-93 (2005).

The facts of this case follow in the same vein as these examples.  The "agency billing" responsibilities enjoyed by Manson surely created an *opportunity* to embezzle and defraud, but absent reason to suspect that Manson had or would abuse the relationship, Travelers had no duty to audit Mason Insurance's books.  Plaintiffs cite no negligence caselaw to the contrary, arguing instead that there *was* reason to suspect fraud: Travelers knew that Manson had set up a centralized P.O. box as a collection address for customer

20

rebate and credit checks.  (Am. Compl., dkt. #28, at ¶47.)  This, plaintiffs argue, should have tipped Travelers off about a "clear possibility of wrongdoing."

In response to this argument, Travelers would have the court take judicial notice that creating a post office box for centralized collection of mail is not at all unusual in the context of insurance agency billing practices.  The court cannot take judicial notice of this "fact," *see* Fed. R. Evid. 201(b), but judging solely from the allegations, a centralized post office box does not seem incongruent with the agency billing arrangement described in the complaint.  In fact, it makes perfect sense, given that Manson was tasked with "collecting premiums from the Plaintiffs and the Class, for Travelers' benefit, and disbursing credits and rebates to the Plaintiffs and the Class," (Am. Compl., dkt. #28, at ¶24).  If plaintiffs believe that the creation of a post office box was suspicious, it is their duty to plead facts making this inference plausible.

## III.  Travelers' Indirect Civil Liability for Manson's Criminal Activity (Count 3)

While Travelers may be liable for Manson's torts under an apparent agency theory, it is not civilly liable for Manson's *crimes*.  Count 3 of the Complaint invokes a right to recover pursuant to Wis. Stat. § 895.446, which provides a civil remedy for harm arising out of acts that violate Wisconsin criminal statutes – in this case, the crimes of theft, Wis. Stat. § 943.20(1), and unauthorized use of identifying information, Wis. Stat. § 943.201(2), § 943.203(2).  Section 895.446(1) states in pertinent part that "[a]ny person who suffers damage or loss by reason of intentional conduct . . . that is prohibited

under [certain criminal statutes] . . . has a cause of action against the person who caused the damage or loss."

According to Travelers, § 895.446 simply makes clear that those who would be found criminally liable can be made civilly liable for the resulting damages.  Travelers would, therefore, bear no civil liability under this statute because "a corporation may be held criminally liable for the acts of an agent or employee when such agent or employee acts within the scope of his employment in behalf of the corporation."  *State v. Richard Knutson, Inc.*, 196 Wis. 2d 86, 106, 537 N.W.2d 420, 427 (Wis. Ct. App. 1995) (quoting WIS JI-Criminal 430).  Plaintiffs' sole response is that Travelers *would* be criminally liable if Manson acted within the scope of its agency.  As already discussed, however, the allegations in the complaint preclude a finding that Manson was acting to benefit Travelers when it stole from plaintiffs.  (See *supra* § I.A.)

## IV.  Punitive Damages

Plaintiffs also seek punitive damages from Travelers in connection with their claims for fraud and conversion (Am. Compl., dkt. #28, at ¶¶ 61, 80), but Travelers is exempt from such an award under the "complicity rule" for punitive damages.  This rule provides that:

> Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if, (a) the principal or a managerial agent authorized the doing and the manner of the act, or (b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d)

> the principal or a managerial agent of the principal ratified or
> approved the act."

Restatement (Second) of Torts § 909.

While it may be debatable whether Manson was established as a "managerial agent" for Travelers, the answer to that question does not affect the outcome here.  No liability attaches under the rule because the allegations neither support an inference that Travelers authorized Manson's conduct (parts a & d), nor that Travelers was reckless in retaining Manson as an agent (part b).  And, as previously discussed, the allegations actually show that Manson's torts were committed outside the scope of its agency (part c).  (See *supra* § I.A.)

In response, plaintiffs argue that the "complicity rule" is not the law in Wisconsin. The court disagrees, based on a line of Wisconsin cases including, though not beginning with, *Garcia v. Samson's Inc.*, 10 Wis. 2d 515, 103 N.W.2d 565 (Wis. 1960).  In *Garcia*, the plaintiff sued the employer of three men who had assaulted her and obtained a favorable jury verdict, including an award of punitive damages.  *Id.* at 517.  The trial court ordered a new trial, partially on grounds that the jury had been improperly instructed on the question of punitive damages.  *Id.* at 517-18.  Affirming the trial court, the Wisconsin Supreme Court noted that "no recovery could be had against the defendant for the tortious act of the employees without proof that the defendant authorized or ratified the alleged tortious act."  *Id.* at 518.

Ten years later, in affirming the denial of punitive damages in a similar case, the Wisconsin Supreme Court observed that *Garcia* "reaffirmed a well established line of cases refusing punitive damages in tort against a corporate defendant without proof that

23

the defendant authorized or ratified the alleged tortious act of its employee." *Mid-Continent Refrigerator Co. v. Straka*, 47 Wis. 2d 739, 748-49 (Wis. 1970).  Four years after that, the Court again cited *Garcia* adopting the complicity rule in Wisconsin.  *D. R. W. Corp. v. Cordes*, 65 Wis.2d 303, 311 n.11, 222 N.W.2d 671, 676 (Wis. 1974).

Plaintiffs' position to the contrary rests entirely upon a single case, *Wangen v. Ford Motor Co.,* 97 Wis.2d 260, 294 N.W.2d 437 (Wis. 1980), in which the Wisconsin Supreme Court noted:

> There is a continuing debate [in Wisconsin] between supporters of the "complicity rule" (which imposes liability for punitive damages on the corporation when a superior officer ordered, participated in, or ratified the misconduct) and supporters of the "vicarious liability rule" (which imposes liability for punitive damages on the corporation for the misconduct of all employees acting within the general scope of their employment).

*Id.* at 291.  Although *Wangen* is the most recent Wisconsin Supreme Court case to discuss agency and punitive damages liability, the court does not consider it controlling law.  For one thing, the above-quoted discussion in *Wangen* is pure dictum.  For another, it fails to mention (let alone distinguish) *Garcia, Mid-Continent*, *D.R.W.* or any of the other earlier cases in a "well-established line."  Finally, in the three decades since its issuance, *Wangen* has not been cited for the disputed principle by a single Wisconsin state court at any level.[5]  Accordingly, the court finds that *Garcia* and its progeny have never been overruled and that the "complicity rule" remains good law in Wisconsin.[6]

---

[5]  *Wangen* was cited for this principle by a Wisconsin federal court in *Schimpf v. Gerald, Inc.*, 52 F. Supp. 2d 976, 1002, (E.D. Wis. 1999), but only in dictum.

[6]  Even if the court were to accept *Wangen* as controlling, the next step would be for this court to choose which doctrine — "complicity" or "vicarious liability" — would be

**V. Dismissal With Prejudice**

Throughout its motion to dismiss, Travelers has insisted that some or all of plaintiffs' claims should be dismissed with prejudice, on grounds that plaintiffs have already amended their complaint once after seeing the arguments presented in Travelers' initial motion to dismiss.  While recognizing Travelers' point that plaintiffs have made (or should have made) every amendment to the pleadings available to defeat Travelers' anticipated dismissal arguments, it would be premature to conclude at this point that it would be futile to dismiss the claims without prejudice.  Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, the court is instructed to freely give leave to amend when justice so requires.  With the interests of justice foremost in mind, Travelers' motion to dismiss plaintiffs' claims with prejudice will be denied at this time.

---

adopted by the Wisconsin Supreme Court today.  In that event, the court would choose the complicity rule, both because the weight of Wisconsin authority falls in favor of that rule, and because it appears the better policy.  *See* Restatement (Third) of Agency § 7.03 cmt. e ("The approach outlined in § 909 [the complicity rule] is preferable because it requires consideration of circumstances relevant to a principal's culpability.").  Moreover, even if the "vicarious liability" standard prevailed, the allegations in the Complaint establish Manson was acting outside the scope of its agency.

ORDER

IT IS ORDERED that defendants St. Paul Fire & Marine Insurance Company's and The Travelers Indemnity Company's motion to dismiss plaintiff's amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) (dkt. #31) is GRANTED IN PART AND DENIED IN PART consistent with the discussion above.

Entered this 25th day of October, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

26